[936 NYS2d 112]

Kenneth Bennett, Appellant, v Health Management Systems, Inc., Respondent.

First Department, December 20, 2011

**APPEARANCES OF COUNSEL**

*Simon, Eisenberg & Baum, LLP*, New York City (*Sheldon Karasik* of counsel), for appellant.

*Tarter Krinsky & Drogin LLP*, New York City (*Richard L. Steer* and *Tara T. Toevs* of counsel), for respondent.

**OPINION OF THE COURT**

ACOSTA, J.

This appeal gives us the opportunity to address the eviden-

tiary showing required at the summary judgment stage in a discrimination case brought pursuant to the New York City Human Rights Law. We hold that defendant has met its evidentiary burden and has shown its entitlement to the extraordinary remedy of judgment as a matter of law.

Background

Plaintiff, Kenneth Bennett, a 47-year-old Caucasian, was hired in 2004 by defendant Health Management Systems, Inc. (HMS), in the Data Processing Operations Unit (DPO). Four years later, he was asked to consider becoming part of the Technical Operations Support (TOS) team on the night shift, and he accepted. Approximately one month into his new position, plaintiff asked to be transferred back to DPO because, he alleged, Cynthia Bowen, the African-American manager of the TOS team, "unfairly and intemperately criticized his performance often and without cause, making it impossible for [him] to master the job." Plaintiff's request was denied, and he was terminated shortly thereafter. According to plaintiff, he was terminated for age and race-related reasons, in violation of state and city human rights laws. Defendant asserted that it terminated plaintiff for poor job performance, including consuming alcohol on the job.

Plaintiff commenced this action against HMS, asserting five causes of action. The first was for breach of contract. The second and third, for age discrimination under section 296 of the Executive Law (New York State Human Rights Law [State HRL]) and section 8-107 (1) (a) of the Administrative Code of the City of New York (New York City Human Rights Law [City HRL]), respectively, alleged that defendant discriminated against him on the basis of age by denying him reassignment to his former unit, and replacing him with an individual who was significantly younger than he. Plaintiff's fourth and fifth causes of action, brought under the State HRL and the City HRL, respectively, alleged that defendant discriminated against him on the basis of race because his supervisors and coworkers in his unit were black and he was white.

Defendant moved to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7). The court granted the motion solely to the extent of dismissing the breach of contract claim. Defendant filed its answer, asserting various affirmative defenses, including that plaintiff was terminated because of repeated violations of company policies that prohibited the consumption of alcoholic beverages and being under the influence of alcohol while at work.

32

Several months later, defendant moved for summary judgment dismissing the complaint pursuant to CPLR 3212, arguing that its proffered reason for terminating plaintiff was legitimate and nondiscriminatory, and could not be shown to be pretextual.

The evidentiary materials submitted by defendant included the affidavit of Claude B. Phipps, Director of Data Processing Operations and Technical Services, who submitted documentation establishing that of the 35 people in the DPO and TOS, 77% were between the ages of 40 and 64 years old, and that 80% of the white employees in DPO and TOS were between the ages of 46 and 64 years old. Phipps also stated that in 2004 plaintiff was found with alcohol on the premises and given an oral warning.

The affidavit of Cynthia A. Bowen, the manager of TOS, explained that there were problems with plaintiff's attendance and job performance from the time he joined TOS. In fact, after approximately one month he was granted a week's vacation and an additional three-week leave of absence to "get his head together." Upon his return, his performance continued to suffer. Bowen believed that the poor performance was due to plaintiff sleeping on the job and leaving his shift early without explanation or permission. She received reports from his coworkers of plaintiff drinking and sleeping on the job. Plaintiff was warned at a meeting with Bowen and Phipps in early May 2008 that his poor performance was jeopardizing his job, and given two weeks to improve, or his employment would be terminated.

Michael O'Rourke, a 47-year old white male, and Senior Director of Operations, described an incident that occurred in January 2005, while plaintiff still worked in DPO, prompting O'Rourke to write plaintiff up for having alcohol on the premises. O'Rourke had become suspicious after observing plaintiff making frequent trips to his locker, and discovered, upon investigation, that plaintiff had an alcoholic beverage disguised in a Mountain Dew bottle in an open duffel bag in his locker. Plaintiff was then given a final written warning.

Waldemar Rivera, a Technical Operations Support Analyst, stated in his affidavit that he was assigned to train plaintiff when plaintiff was transferred to TOS. He stated that it was "very difficult and frustrating" trying to work with and attempting to train plaintiff, because he often reeked of alcohol, slurred his words, and did not pay attention or take notes. Rivera also stated that plaintiff's confusion seemed to increase

over time, and that it appeared that he had difficulty keeping his eyes open. Three other employees also smelled alcohol on plaintiff's breath, and stated that plaintiff had trouble focusing on the job.

In opposition, plaintiff averred that he believed that defendant's refusal to allow him to transfer back to his former unit was "solely for purposes of harassment motivated by hostility to his age and race." He denied receiving any warning that he was guilty of misconduct or poor job performance that, if left uncorrected, could lead to his termination. He asserted that he was not an alcoholic, and never appeared for work under the influence of alcohol. He admitted that he did take naps during his shift, but asserted that other employees did the same, since it was common practice to do so during the overnight shifts. Plaintiff averred that prior to his transfer, he was supervised by a white male and received a "very good" performance appraisal in November 2007. Plaintiff denied allegations that he failed to take notes during his training, and maintained that he was replaced by a much younger, inexperienced individual.

By order entered March 11, 2010, the court granted defendant's summary judgment motion, finding that there was no evidence in the record to support plaintiff's claim of age discrimination (2010 NY Slip Op 33753 [U] [2010]). The court found that plaintiff's affidavit in opposition to the motion did not contain any factual allegations to support his second and third causes of action for age discrimination, since it stated little more than the fact that he was 47 years old at the time of his termination. The court noted that plaintiff made no allegations that derogatory comments were made concerning his age or that younger individuals were treated more favorably, and did not refute the fact that he was replaced by a 54-year-old employee. With regard to plaintiff's fourth and fifth causes of action for racial discrimination, the court noted that plaintiff's claims that his termination raised an inference of discrimination were based on the fact that both of his supervisors and his unit coworkers were black. However, the court observed that defendant submitted evidence that plaintiff was fired because he performed his job poorly, was found sleeping on the job, had brought a bottle of alcohol to work in violation of company policy, and reeked of alcohol. The court noted that although plaintiff's affidavit in opposition stated that criticism of his work was "unfounded," he offered no facts or evidence to establish that the suspicions and concerns offered by defendant were pretextual. And plaintiff did

not deny that he had been caught numerous times sleeping on the job or that he had brought alcohol to work.

This appeal followed.

Analysis

I.

Six years after the passage of the New York City Local Civil Rights Restoration Act (Local Law No. 85 [2005] of City of NY) (Restoration Act), it is beyond dispute that the City HRL now "explicitly requires an independent liberal construction analysis *in all circumstances*," an analysis that "must be targeted to understanding and fulfilling what the statute characterizes as the City HRL's 'uniquely broad and remedial' purposes, which go beyond those of counterpart state or federal civil rights laws" (*Williams v New York City Hous. Auth.*, 61 AD3d 62, 66 [2009], *lv denied* 13 NY3d 702 [2009] [emphasis added]).

Our Court of Appeals has emphasized that the Restoration Act's amendment of section 8-130 of the City HRL was enacted to ensure the liberal construction of the City HRL by requiring that *all* provisions of the City HRL be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (*Albunio v City of New York*, 16 NY3d 472, 477-478 [2011]; *see also Nelson v HSBC Bank USA*, 87 AD3d 995 [2011] [adopting this Court's holding in *Williams* that considerations of severity or pervasiveness applicable in state and federal harassment cases are impermissible in determining liability in discriminatory harassment cases under the City HRL]; *Loeffler v Staten Is. Univ. Hosp.*, 582 F3d 268, 278 [2009] [explaining that "claims under the City HRL must be reviewed independently from and 'more liberally' than their federal and state counterparts"]).

Despite these clear directives, no court has yet undertaken an examination of whether, and to what extent, the three-step burden-shifting approach set forth in *McDonnell Douglas Corp. v Green* (411 US 792 [1973]), must be modified for City HRL claims, particularly in the context of the adjudication of summary judgment motions. That examination is overdue, and we begin the process here.

II.

As a preliminary matter, the identification of the framework for evaluating the sufficiency of evidence in discrimination cases does not in any way constitute an exception to the section 8-130

rule that all aspects of the City HRL must be interpreted so as to accomplish the uniquely broad and remedial purposes of the law (*see Williams*, 61 AD3d at 67 and n 4, 68, 74). Indeed, the Restoration Act had among its explicit purposes *the rejection and overruling* of the doctrine in *McGrath v Toys "R" Us, Inc.* (3 NY3d 421, 433-434 [2004]), which indicated that the City Council would need to amend the City HRL to specifically depart from a federal doctrine if it wanted to do so (*see Williams*, 61 AD3d at 73-74).[1] In any event, for us to create an exemption from the sweep of the Restoration Act for the most basic provision of the City HRL—that it is unlawful "to discriminate"—would impermissibly invade the legislative province.[2] And walling off from examination the doctrines that are appropriate to shape the presentation and evaluation of evidence that "discrimination" has occurred would create just such an exemption.

## III.

The *McDonnell Douglas* (411 US 792 [1973]) burden-shifting approach initially requires only that the plaintiff make a prima facie showing of membership in a protected class and that an adverse employment action had been taken against him. The adverse action must have occurred under circumstances giving rise to an inference of discrimination.[3] Once that minimal showing is made, the burden shifts to the defendant to articulate

---

**1.** See *also Williams*, 61 AD3d at 67 (when the Restoration Act was enacted, it was made plain that the intention was to legislatively overrule for City HRL purposes cases that had "either failed to interpret the City Human Rights Law to fulfill its uniquely broad purposes, ignore[d] the text of specific provisions of the law, or both." Among the illustrations of cases that, post-Restoration Act, would no longer "hinder the vindication of our civil rights" were *McGrath* and *Forrest v Jewish Guild for the Blind* [3 NY3d 295 (2004)]).

**2.** *See Matter of Meegan v Brown*, 16 NY3d 395, 403 (2011) ("While examining the specific language of statutory provisions is part of our inquiry, we must also look to the underlying purpose and the statute's history as '[w]e are mindful that in "the interpretation of statutes, the spirit and purpose of the act and the objects to be accomplished must be considered. The legislative intent is the great and controlling principle." ' ") (citations omitted); *Brothers v Florence*, 95 NY2d 290, 299 (2000) ("While interpretation must begin with an examination of the language itself, where a statute does not expressly address the issue, the reach of the statute ultimately becomes a matter of judgment made upon review of the legislative goal") (internal quotation marks and citation omitted).

**3.** In *McDonnell Douglas* itself, the Court held that the prima facie case could be made out

> "by showing (i) [the complainant] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifica-

through competent evidence nondiscriminatory reasons that actually motivated defendant at the time of its action (*id.* at 802). If that burden is successfully shouldered then plaintiff must show those reasons to be false or pretextual (*id.*). The basic idea behind the *McDonnell Douglas* burden-shifting procedure—that is, that discrimination rarely announces itself, and that victims of discrimination need a way to prove their case circumstantially—is sound. But some aspects of the way it has been applied—especially in the summary judgment context—can undercut the City HRL's intent to maximize the opportunities for discrimination to be exposed.[4] For instance, the last prong of a plaintiff's prima facie showing—that adverse action has been taken against plaintiff under circumstances giving rise to an inference of discrimination—can, if its limited function is not understood correctly, transmute that prong into one that requires a plaintiff to prove his entire case. In the hypothetical situation where a plaintiff makes an initial showing that some of his younger colleagues were not subjected to the adverse action imposed on him, and where it is assumed that the basic showing is indeed true,[5] it can certainly also be true that those colleagues were not similarly situated to plaintiff because

tions, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications" (411 US at 802).

4. *See Williams*, 61 AD3d at 68 (in
"telling us that the City HRL is to be interpreted 'in line with the purposes of the fundamental amendments to the law enacted in 1991,' the Council's committee was referring to amendments that were 'consistent in tone and approach: every change either expanded coverage, limited an exemption, increased responsibility, or broadened remedies. In case after case, the balance struck by the Amendments favored victims and the interests of enforcement over the claimed needs of covered entities in ways materially different from those incorporated into state and federal law' " [citing Gurian, *A Return to Eyes on the Prize: Litigating under the Restored New York City Human Rights Law*, 33 Fordham Urb LJ 255, 288 (2006)]).

5. This illustration is not intended to suggest, and should not be construed as holding, that this particular showing is somehow an essential requisite of the prima facie case in all or a subset of discrimination matters. On the contrary, the prima facie case method established in *McDonnell Douglas* "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination" (*see Furnco Constr. Corp. v Waters*, 438 US 567, 577 [1978]).

plaintiff engaged in misconduct and they did not. But the explanatory second set of facts, such as the absence of such misconduct by the plaintiff's colleagues, should not be relied on to negate the plaintiff's prima facie case in the first instance, but rather, seen as either: (a) the defendant's articulation through competent evidence of nondiscriminatory reasons for its action (stage two in the *McDonnell Douglas* framework); or (b) part of the defendant's ultimate effort to undercut the weight assigned to the plaintiff's evidence and thus disprove the plaintiff's claim that it was more likely than not that discrimination played a role in defendant's actions.

If this caution is not taken, the result will be inconsistent with the intent of *McDonnell Douglas,* and, more importantly, with that of the City HRL. As the Supreme Court said long ago, the burden of establishing a prima facie case of discrimination is "not onerous" (*Texas Dept. of Community Affairs v Burdine*, 450 US 248, 253 [1981]).[6] The reasons were, and remain, obvious. First, discrimination rarely announces itself, so that generally a discrimination plaintiff must ask the factfinder to infer the defendant's intent from circumstantial evidence that can be difficult to obtain.[7] Second, the defendant, by definition, is in a materially better position to provide evidence as to its actual motivation than the plaintiff. Third, the *McDonnell Douglas* burden of production on a defendant that is triggered by a plaintiff's initial presentation of a prima facie case is itself neither onerous or unfair: all a defendant is being required to do in

---

**6.** Judicial construction of counterpart state and federal civil rights statutes can serve as an aid in interpretation to the City HRL to the extent that the construction of the counterpart statute is understood as providing a floor of rights under which the City HRL cannot fall, not a ceiling above which the City HRL cannot rise (Local Law No. 85 [2005] of City of NY § 1), and is also not understood as a determination of, or replacement for, the ultimate and necessary question that a court, pursuant to Administrative Code § 8-130, must determine independently: what interpretations of the questions before it best fulfill the City HRL's uniquely broad and remedial purposes.

**7.** *See e.g. Dister v Continental Group, Inc.*, 859 F2d 1108, 1112 (1988) ("The allocation of burdens and imposition of presumptions in Title VII and ADEA cases recognizes the reality that direct evidence of discrimination is difficult to find precisely because its practitioners deliberately try to hide it. Employers of a mind to act contrary to law seldom note such a motive in their employee's personnel dossier. Specific intent will only rarely be demonstrated by 'smoking gun' proof . . . The *McDonnell Douglas* procedure attempts to compensate for this lack of evidence to ensure that the employee has his or her day in court") (citation omitted).

that circumstance is to come forward with competent evidence of what it knows, that is, the reason or reasons for its actions.[8] Finally, the existence of discrimination—a profound evil that New York City, as a matter of fundamental public policy, seeks to eliminate[9]—demands that the courts' treatment of such claims maximize the ability to ferret out such discrimination, not create room for discriminators to avoid having to answer for their actions before a jury of their peers.[10]

Unlike the intended role for a de minimis prima facie showing, the task of challenging a defendant's proffered nondiscriminatory reasons can frequently be onerous. It often involves questions such as appropriate comparators and evidence of work performance (and discipline) of others. To conflate this broader obligation with the initial prima facie obligation contravenes the purpose of the *McDonnell Douglas* procedure for the order and requirement of proof, a procedure that is simply a mechanism designed to give a full opportunity for cases of possible discrimination to be heard. In fact, to conflate this obligation improperly merges the proof and role of the prima facie case with the proof and role of plaintiff's ultimate burden.

In the context of a summary judgment motion, of course, once a defendant has laid bare its proof, a plaintiff is compelled to do the same. But that is the point: once the defendant has revealed its evidence, the case has moved to a different level of specificity. At the summary judgment stage, a court should not confuse the limited assessment of all the evidence in the case (an issue identification function, not an issue resolution function) with a retroactive critique of the adequacy of the initial *prima facie* showing. If a court were to tarry at all at the summary judgment stage on the question of whether a prima facie

---

**8.** That it may sometimes be unpleasant for a defendant to be candid does not change the fact that the reason or reasons for conduct are or should be easily available to a defendant.

**9.** In the City HRL formulation, "there is no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of groups prejudiced against one another and antagonistic to each other because of their actual or perceived differences" (Administrative Code § 8-101). The goal is to "eliminate and prevent discrimination" from, as added in 1991, "playing any role" in actions related to the employment, housing, and public accommodations contexts (*id.*).

**10.** The Committee Report on the Restoration noted that acts of discrimination cause "serious injury, to both the persons directly involved and the social fabric of the City as a whole, which will not be tolerated" (Rep of Comm on Gen Welfare, Local Law No. 85 [2005] of City of New York, 2005 NY City Legis Ann, at 537).

case has been made out, it would need to necessarily ask whether the initial facts described by the plaintiff, *if not otherwise explained,* give rise to the *McDonnell Douglas* inference of discrimination.

Therefore, where a defendant on a summary judgment motion has produced evidence that justifies its adverse action against the plaintiff on nondiscriminatory grounds, the plaintiff may not stand silent. The plaintiff must either counter the defendant's evidence by producing pretext evidence (or otherwise), or show that, regardless of any legitimate motivations the defendant may have had, the defendant was motivated at least in part by discrimination. The point of the *McDonnell Douglas* procedure was to recognize the imbalance between the information initially available to a plaintiff and the information possessed by a defendant. In the interests of making real the promise of anti-discrimination law, the *McDonnell Douglas* three-prong approach requires a defendant to come forward to provide nondiscriminatory reasons for its actions, in order to eliminate the presumption of discrimination that the prima facie case had theretofore established. A defendant's production of evidence supporting its position that it acted for nondiscriminatory reasons does not mean that a prima facie case had not been created in the first instance, and courts should not treat such evidence as doing so.

## IV.

Does it even make sense to examine at the summary judgment stage whether an initial prima facie case has been made out? As the Supreme Court held almost 30 years ago:

> "Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether 'the defendant intentionally discriminated against the plaintiff' " (*Postal Service Bd. of Governors v Aikens*, 460 US 711, 715 [1983] [citation omitted]).

This reasoning applies in this context as well.

Where a defendant in a discrimination case has moved for summary judgment and has offered evidence in admissible form of one or more nondiscriminatory motivations for its actions, a court should ordinarily avoid the unnecessary and sometimes

confusing effort of going back to the question of whether a prima facie case has been made out in the first place. Instead, the court should turn to the question of whether the defendant has sufficiently met its initial burden as the moving party of showing that there is no evidentiary route that could allow a jury to believe that discrimination played a role in the challenged action. We stop short of holding that there is *never* a circumstance under the City HRL where such an inquiry would be proper, but do conclude that such circumstances will be rare and unusual.[11]

## V.

There remain two factors to consider. First, it is essential to remember that the *McDonnell Douglas* evidentiary framework is not the only evidentiary framework applicable to discrimination cases. It is not uncommon for covered entities to have multiple or mixed motives for their action, and the City HRL proscribes such "partial" discrimination since "[u]nder Administrative Code § 8-101, discrimination shall play no role in decisions relating to employment, housing or public accommodations" (*see Williams*, 61 AD3d at 78 n 27; *see also* Rep of Comm on Gen Welfare, Local Law No. 85 [2005] of City of New York, 2005 NY City Legis Ann, at 537; *Weiss v JP Morgan Chase & Co.*, 2010 WL 114248, *1, 2010 US Dist LEXIS 2505, *1-2 [SD NY 2010] [the City HRL "requires only that a plaintiff prove that age was 'a motivating factor' for an adverse employment action"]).

A plaintiff's response to a defendant's showing of nondiscriminatory reasons for its actions can take a variety of forms. In some cases, the plaintiff may present evidence of pretext and independent evidence of the existence of an improper discriminatory motive. In other cases, the plaintiff may leave unchallenged one or more of the defendant's proffered reasons for its actions, and may instead seek only to show that discrimination was just one of the motivations for the conduct.[12] In addition, evidence of an unlawful motive in the mixed motive context need not be

---

**11.** The granting of a motion based on the absence of a prima facie showing of "circumstances giving rise to an inference of discrimination" would be even more rare given the clarification, supra, of the limited evidence required for that purpose.

**12.** *Cf.* 42 USC § 2000e-2 (m), which provides that it is "an unlawful employment practice . . . when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." Note that the City HRL does not provide for the limitations on relief in mixed-

direct, but can be circumstantial—as with proof of any other fact (*see Desert Palace, Inc. v Costa*, 539 US 90 [2003]).

On a motion for summary judgment, defendant bears the burden of showing that, based on the evidence before the court and drawing all reasonable inferences in plaintiff's favor, no jury could find defendant liable under any of the evidentiary routes: under the *McDonnell Douglas* test, or as one of a number of mixed motives, by direct or circumstantial evidence.

## VI.

The critical remaining question concerns the proper impact of a plaintiff's evidence that one or more of the nondiscriminatory reasons put forward by a defendant is false, incomplete, or misleading—generally referred to as pretext evidence. A sharply divided Supreme Court ruled that a factfinder's rejection of what the employer has proffered as a legitimate, nondiscriminatory reason for its action does not compel judgment for the plaintiff, reasoning that a pretext is not necessarily a pretext for discrimination (*see St. Mary's Honor Center v Hicks*, 509 US 502, 511 [1993]). Several years later, the Supreme Court concluded, in *Reeves v Sanderson Plumbing Products, Inc.* (530 US 133 [2000]), that a plaintiff's claim of discrimination can indeed survive a defendant's motion for summary judgment by the quantum of evidence that made up plaintiff's prima facie case, along with evidence that the employer's proffered justification for its action was false. The *Reeves* Court rejected the proposition that additional evidence tending to show that the false explanation was a cover-up for discrimination was needed to survive summary judgment, sometimes termed the "pretext plus" view. It confirmed that a jury is entitled to infer from the evidence of falsity that the cover-up was a cover-up of discrimination, but rejected the position that proving the falsity of a defendant's proffered reason automatically entitled the plaintiff to judgment—sometimes termed the "pretext must" view.

The Supreme Court did not simply caution lower courts that juries should be issued a permissive rather than mandatory instruction as to the inference of discrimination to be drawn from evidence of a false reason for action. It effectively suggested that summary judgment could still be routinely granted in a defendant's favor even where evidence of falsity had been produced by plaintiff:

motive cases set forth in 42 USC § 2000e-5 (g) (2) (B) (*see* Gurian, *Return to Eyes on the Prize*, 33 Fordham Urb LJ at 312-313).

"Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law" (*Reeves*, 530 US at 148-149).

Whatever the merits of the Supreme Court's decision as a matter of federal law may or may not be, *Reeves* did not sufficiently consider factors crucial to interpreting the City HRL in a way that is "uniquely broad and remedial." These factors include: (a) the traditional power to be accorded to the inference of wrongdoing that arises from evidence of consciousness of guilt; (b) the importance of deterring a defendant's proffer of false reasons for its conduct; and (c) the impropriety of a court weighing the strength of evidence in the context of a summary judgment motion.

As to consciousness of guilt, it is hardly a new proposition that "[r]esort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct" (*Sheridan v E.I. DuPont de Nemours & Co.*, 100 F3d 1061, 1069 [3d Cir 1996, en banc], *cert denied* 521 US 1129 [1997], quoting *Binder v Long Is. Light. Co.*, 57 F3d 193, 200 [1995]; *see also Fisher v Vassar Coll.*, 114 F3d 1332, 1390-1391 [1997, Winter, J., dissenting], *cert denied* 522 US 1075 [1998] [noting that *Binder* did nothing but apply the "universally recognized principle" that consciousness of guilt may be inferred from dishonest behavior concerning facts material to litigation to "false exculpatory statements by employers," and pointing out the equivalently universal principle that a jury that finds that a witness has lied in a material part of his or her testimony may "disbelieve other material parts of that witness's testimony"]).

This principle is especially important in the employment discrimination context. As the four dissenters noted in *Hicks*, the *McDonnell Douglas* procedure invests the employer (via its decision on how to meet its burden of production) with "the right to choose the scope of the factual issues to be resolved by the factfinder" (*Hicks*, 509 US at 529). Not only is it the case that the procedure "has no point unless the scope it chooses binds the employer as well as the plaintiff" (*id.*), but there is

also an independent interest in deterring the presentation of false reasons in the discrimination context.

It is often the case that the dispute involves not a single, easily isolated incident, but rather an ongoing relationship that has context and nuance. It is difficult enough to discern a defendant's motive or motives in those circumstances without giving it a tactical advantage to throwing numerous nondiscriminatory justifications against the wall and seeing which stick. It must thus be the defendant's obligation to articulate its true reasons for acting in the way that it did. And the maximum deterrent effect sought by the City HRL can only be achieved where covered entities understand that, whatever the urge may be to cover up their actual motivations before arriving in court, there can be no benefit for doing so once in court (*cf. Hicks*, 509 US at 543 [Souter, J., dissenting] ["I see no reason why Title VII interpretation should be driven by concern for employers who are too ashamed to be honest in court, at the expense of victims of discrimination who do not happen to have direct evidence of discriminatory intent"]).

The Supreme Court in *Reeves* was not wrong to state that the strength of a prima facie case can vary. Likewise, the strength of "consciousness of guilt" evidence is not a constant from case to case, and the totality of evidence available to be assessed is case specific. All of these factors are sound reasons why a jury is instructed that it may (not must) infer discrimination when it finds that an employer's explanation of its conduct is unworthy of credence. But the extraordinary remedy of summary judgment presents a different context.

Once there is some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete, a host of determinations properly made only by a jury come into play, such as whether a false explanation constitutes evidence of consciousness of guilt, an attempt to cover up the alleged discriminatory conduct, or an improper discriminatory motive coexisting with other legitimate reasons.[13] These will be jury questions except in the most extreme and unusual circumstances. Proceeding in this way reaffirms the principle that "trial courts must be especially chary in handing out summary judgment in discrimination cases, because in such cases the

---

**13.** If one explanation offered by a defendant is able to be construed by a jury as false and therefore evidence of consciousness of guilt, that same jury would be permitted to weigh that evidence when assessing the veracity of the other explanations the defendant has offered.

employer's intent is ordinarily at issue" (*Chertkova v Connecticut Gen. Life Ins. Co.*, 92 F3d 81, 87 [1996], *cert denied* 531 US 1192 [2001]; *see also Patrick v LeFevre*, 745 F2d 153, 159 [1984]).

We recognize that there has been a growing emphasis on using summary judgment in discrimination cases to promote "judicial efficiency."[14] But at least in the context of the City HRL, the Restoration Act provides a clear and unambiguous answer: a central purpose of the legislation was to resist efforts to ratchet down or devalue the means by which those intended to be protected by the City HRL could be most strongly protected (*cf. Williams*, 61 AD3d at 72-73).[15] These concerns warrant the strongest possible safeguards against depriving an alleged victim of discrimination of a full and fair hearing before a jury of her peers by means of summary judgment. In short, evidence of pretext should in almost every case indicate to the court that a motion for summary judgment must be denied.[16]

---

**14.** *See e.g. Shager v Upjohn Co.*, 913 F2d 398, 403 (1990, Posner, J.) ("The growing difficulty that district judges face in scheduling civil trials, a difficulty that is due to docket pressures in general . . . , makes appellate courts reluctant to reverse a grant of summary judgment merely because a rational factfinder *could* return a verdict for the nonmoving party, if such a verdict is highly unlikely as a practical matter because the plaintiff's case . . . is marginal"); *Canitia v Yellow Frgt. Sys., Inc.*, 903 F2d 1064, 1068 (1990, Nelson, J., concurring), *cert denied* 498 US 984 (1990) ("Given the demands now being made on the time of most district courts, it seems to me that a full-scale trial in a case as lopsided as this one would probably be a misallocation of judicial resources").

**15.** Given the serious questions regarding the actual efficiency gains of summary judgment (*see generally* Rave, *Questioning the Efficiency of Summary Judgment*, 81 NYU L Rev 875 [2006]), we are not convinced that the City's emphasis on ensuring that discrimination cases are resolved before a jury is necessarily inconsistent with maximizing the scarce use of judicial resources.

**16.** We cannot put this holding in absolute terms—there can be limited exceptions to the rule that emerge on a case-by-case basis—but we write here to underline that the exceptions are intended to be true exceptions (*compare Williams*, 61 AD2d at 73-80, 80 n 30 [the rule is that any difference in treatment reflected by harassment is actionable gender-based discrimination, with narrowly drawn affirmative defense to "narrowly target concerns about truly insubstantial cases" designed with the goal of making certain to avoid "improperly giving license to the broad range of conduct that falls between 'severe or pervasive' on the one hand and a 'petty slight or trivial inconvenience' on the other," with emphasis on the need to permit borderline situations to be heard by a jury, and with finding that one could "easily imagine a single comment that objectifies women being made in circumstances where

## VII.

■ To summarize, then, for purposes of consideration of summary judgment motions in discrimination cases brought under the City HRL:

(1) If a court were to find it necessary to consider the question of whether a prima facie case has been made out, it would need to ask the question, "Do the initial facts described by the plaintiff, *if not otherwise explained*, give rise to the *McDonnell Douglas* inference of discrimination?"

(2) Where a defendant has put forward evidence of one or more nondiscriminatory motivations for its actions, however, a court should ordinarily avoid the unnecessary and sometimes confusing effort of going back to the question of whether a prima facie case has been made out. Instead, it should turn to the question of whether the defendant has sufficiently met its burden, as the moving party, of showing that, based on the evidence before the court and drawing all reasonable inferences in plaintiff's favor, no jury could find defendant liable under any of the evidentiary routes—*McDonnell Douglas*, mixed motive, "direct" evidence, or some combination thereof.

(3) If the plaintiff responds with some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete, a host of determinations properly made only by a jury come into play, and thus such evidence of pretext should in almost every case indicate to the court that a motion for summary judgment must be denied.

Applying these principles to the case at hand, defendant is entitled to summary judgment.

■ Given the circumstances of this case, it makes sense to proceed directly to looking at the evidence as a whole. Defendant put forward evidence of nondiscriminatory motivations,

---

their comment would, for example, signal views about the role of women in the workplace and be actionable"] *and Wilson v N.Y.P. Holdings, Inc.*, 2009 WL 873206, *28, 2009 US Dist LEXIS 28876, *82 [SD NY 2009] [ignoring the *Williams* holding and finding comments like "training females is like 'training dogs' " and "women need to be horsewhipped" to not be actionable]; *Mihalik v Credit Agricole Cheuvreux N. Am., Inc.*, 2011 WL 3586060, *9, 2011 US Dist LEXIS 84790, *27 [SD NY 2011] [wrenching the *Williams* reference to a "general civility code" out of context; inaccurately portraying the case as one whose principal concern was that too many victims of harassment were having the opportunity to be heard by juries, not the opposite; and collecting and relying on some of the many cases that nominally acknowledge *Williams* but ignore its teaching, including *Wilson*]). As with *Williams*, it is our intention that a limited and narrow exception is not intended to be simply the new means by which an old status quo is continued.

specifically, credible evidence of numerous reports of plaintiff's unsatisfactory work performance, including, but not limited to, plaintiff's poor attendance and lack of job focus, and plaintiff's own admission that he was unable to "master [his] job." Even after plaintiff was given a week's vacation and an additional three-week leave to compose himself, his work performance continued to be below expectations. Relatedly, the Director of DPO advised plaintiff that if his work did not improve, he would be terminated. There is also undisputed evidence that plaintiff frequently slept on the job, and that he had left his shift early on several occasions without explanation. These allegations were corroborated by the affidavits of plaintiff's coworkers, who stated that plaintiff was found asleep under the desk of his cubicle, that he was under the influence of alcohol, and that he was unable to handle his responsibilities. Finally, plaintiff was replaced by a worker older than he. This evidence was sufficient to prove that plaintiff was indeed not the victim of age discrimination. Plaintiff put forward no evidence that defendant's explanations were pretextual, nor any evidence that a discriminatory motive coexisted with the legitimate reasons supported by defendant's evidence.

■ Defendant's proof is equally unrebutted when it comes to plaintiff's claims of race discrimination. Plaintiff did not, for example, produce any evidence that there were black coworkers who were similarly situated to plaintiff in terms of poor performance or nonperformance, let alone evidence that a similarly situated black coworker was treated more leniently, and he did not produce any of the innumerable other types of evidence that can point to race playing a role in his employer's decision-making.

Because plaintiff's claims fail under the more protective City HRL, they fail under the State HRL as well. We have reviewed plaintiff's remaining claims and they have no merit.

Accordingly, the order of the Supreme Court, New York County (Marylin G. Diamond, J.), which granted defendant's motion to dismiss the complaint, should be affirmed, without costs.

SAXE, J.P., CATTERSON, ABDUS-SALAAM and ROMÁN, JJ., concur with ACOSTA, J.

Order, Supreme Court, New York County, entered March 11, 2010, affirmed, without costs.