[21 NYS3d 221]

JESSIE CADET-LEGROS, Respondent-Appellant, v NEW YORK UNIVERSITY HOSPITAL CENTER, Doing Business as NEW YORK UNIVERSITY LANGONE MEDICAL CENTER, Appellant-Respondent.

First Department, December 8, 2015

### APPEARANCES OF COUNSEL

*DeLince Law PLLC*, New York City (*J. Patrick DeLince* of counsel), for appellant-respondent.

*Tarter Krinsky & Drogin LLP*, New York City (*Richard L. Steer* and *Laurent S. Drogin* of counsel), for respondent-appellant.

### OPINION OF THE COURT

ACOSTA, J.

Plaintiff, an African-American woman who worked as a clinical supervisor in defendant's Langone Serology/Diagnostic Immunology Lab (the lab), claims that she was discharged from employment because of her race and in retaliation for filing an internal complaint of discrimination. Defendant argues that plaintiff was fired not on the basis of race, but because of her long-standing insubordination and disruptive behavior. We find that, in response to defendant's evidence of a nondiscriminatory reason for firing her, plaintiff failed to adduce evidence that either created a factual dispute as to whether defendant's decision to terminate her employment might have been based in part on race or would allow a reasonable jury to conclude that she was discharged in retaliation for engaging in protected activity, and we therefore dismiss both causes of action.

Facts and Background

Plaintiff was hired in 1992. In 2007, she began to engage in a struggle with her managers concerning her behavior and her resistance to the administrative hierarchy. Plaintiff was first admonished in or around May 2007. Five days later, she was issued a "Final Warning" regarding her "insubordination and unacceptable behavior as a member of the management team." Around that time, plaintiff received a performance evaluation of two out of five, which she claims was retroactively downgraded from a rating of five.

Defendant's personnel continued to complain about plaintiff's inappropriate interactions with them throughout the rest of the year. In January 2008, plaintiff received a two on her performance evaluation for May to December 2007, in which it

was noted that she had failed to improve her communication or respect the chain of command and that she was continuing to inappropriately air her grievances to her staff. Her supervisors warned her that her failure to immediately improve would result in her termination.

In February 2008, plaintiff was once again seen to be conducting herself inappropriately, and one manager said that this was evidence that a "leopard does not change its spots." Another manager, with a less negative view of plaintiff's record from December to February, did not disagree with the first manager's overall characterization, but said that plaintiff's recent "attitude and demeanor" had been excellent.

At this juncture, despite the new incident and the December 2007 warning about termination, plaintiff was not terminated.

In a memo dated August 18, 2008, after several incidents in which she refused to report directly to the designated manager, plaintiff was issued a "Final Warning" for her "refusal to accept [her manager as her] superior and to communicate with him as required." She was again warned that failure to improve would result in immediate termination. Almost immediately thereafter, plaintiff filed an internal complaint of racial discrimination.

Plaintiff received additional warnings because of what defendant described as her continuing insubordination and refusal to report to a manager. One was a "critical alert" in late 2008 and another was a third "Final Warning" in early 2009.

By May 2009, a manager who had maintained over the years that plaintiff should be given additional chances now agreed with another manager that plaintiff did indeed need to be fired. That previously supportive manager and a third manager (the person who had hired plaintiff) then completed plaintiff's final performance evaluation, again giving her a two. A termination letter was prepared on May 11, 2009, and given to plaintiff on May 14, 2009.

Plaintiff brought the instant action in August 2009, asserting four causes of action under the New York City Human Rights Law (the City HRL) (Administrative Code of City of NY § 8-107 et seq.). Only two of the causes of action are relevant to this appeal: disparate treatment (discriminatory discharge) and retaliation. The motion court denied defendant's motion for summary judgment dismissing the disparate treatment claim (to the extent it was predicated on plaintiff's termina-

tion), and granted the motion with respect to the retaliation claim. Both parties appeal.

Discussion

### 1. Standard of Review

■ Where a defendant has "offered evidence in admissible form of one or more nondiscriminatory motivations for its actions, a court should ordinarily avoid the unnecessary and sometimes confusing effort of going back to the question of whether a prima facie case has been made out in the first place" (*Bennett v Health Mgt. Sys., Inc.*, 92 AD3d 29, 39-40 [1st Dept 2011], *lv denied* 18 NY3d 811 [2012]). Instead, the court should focus on "whether the defendant has sufficiently met its burden, as the moving party, of showing that, based on the evidence before the court and drawing all reasonable inferences in plaintiff's favor, no jury could find defendant liable under any of the evidentiary routes [applicable to discrimination cases]" (*id.* at 45).[1] One way for a plaintiff to defeat summary judgment is by offering "some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete" (*id.*).

If the plaintiff succeeds in this regard, "such evidence of pretext should in almost every case indicate to the court that a motion for summary judgment must be denied" (*id.*). This is because once a plaintiff introduces "pretext" evidence, "a host of determinations properly made only by a jury come into play, such as whether a false[,] [misleading, or incomplete] explanation constitutes evidence of consciousness of guilt, an attempt to cover up the alleged discriminatory conduct, or an improper discriminatory motive coexisting with other legitimate reasons" (*id.* at 43).

This formulation, founded on the uniquely broad and remedial purposes of the City HRL, provides the framework for evaluating the sufficiency of evidence, and differs significantly from federal civil rights law (by assigning, for example, more weight to the possibility that a pretextual justification reflects consciousness of guilt).[2] As a practical matter, therefore, the *Bennett* formulation helps embody the *substantive* law appli-

---

**1.** Among these evidentiary routes is the "mixed motive" standard, which permits a plaintiff to defeat summary judgment if he or she can show that the defendant was motivated at least in part by the plaintiff's protected status (*see Bennett*, 92 AD3d at 40-41).

**2.** *See Bennett*, 92 AD3d at 34-35 ("[T]he identification of the framework for evaluating the sufficiency of evidence in discrimination cases does not in

cable to City HRL claims (i.e., what constitutes *because of discrimination*).

How the City HRL's distinctive substantive definitions, standards, and frameworks interact with existing standards for summary judgment has been the subject of some confusion (*see e.g. Mihalik v Credit Agricole Cheuvreux N. Am., Inc.*, 715 F3d 102, 110 n 8 [2d Cir 2013]). As with any other civil case, a discrimination plaintiff must produce enough evidence to preclude the moving defendant from being able to prove that (1) no issues of material fact have been placed in dispute by competent evidence, and (2) a reasonable jury (resolving all inferences that can reasonably be drawn in favor of the non-moving party) could not find for the plaintiff on any set of facts under any theory of the case. But recognizing that the general evidentiary standard remains the same in discrimination cases does not permit a court to *apply* the standard in a manner that ignores the distinctiveness of City HRL causes of action. All the general standard does, in other words, is provide the template that says, "defendant must prove that no reasonable jury can conclude X." The "X" depends on the cause of action.

Thus, the only substantive requirement in a City HRL case where the plaintiff goes the "pretext" route is for the plaintiff to produce some evidence to suggest that *at least one reason* is "false, misleading, or incomplete." A plaintiff who satisfies this requirement may well have produced less evidence than would be required under the state and federal laws. But he or she will have produced enough evidence to preclude the defendant from proving that no reasonable jury could conclude that any of the defendant's reasons was pretextual. In other words, the general evidentiary standard comfortably co-exists with the distinctive substantive framework that must be applied to City HRL claims.[3]

---

any way constitute an exception to the section 8-130 rule that all aspects of the City HRL must be interpreted so as to accomplish the uniquely broad and remedial purposes of the law . . . [F]or us to create an exemption from the sweep of the Restoration Act for the most basic provision of the City HRL—that it is unlawful 'to discriminate'—would impermissibly invade the legislative province. And walling off from examination the doctrines that are appropriate to shape the presentation and evaluation of evidence that 'discrimination' has occurred would create just such an exemption" [footnotes and internal citations omitted]).

3. *Littlejohn v City of New York* (795 F3d 297 [2d Cir 2015]) provides a useful analogy. In that case, the court explained that, while title VII complaints are subject to the same procedural requirements of rule 8 (a) of

## 2. Discriminatory Discharge

■ Plaintiff suffered an adverse action when defendant terminated her employment;[4] the question is whether that action was motivated, in whole or in part, by racial discrimination. Because defendant offered in support of its summary judgment motion admissible evidence of one or more nondiscriminatory motivations for its actions, we will move directly to the question of whether defendant carried its burden of showing that plaintiff did not raise an issue of fact as to whether defendant's reasons were pretextual or whether race otherwise played a part in its decision to fire her (*see Bennett*, 92 AD3d at 39-40). We conclude that, notwithstanding the more plaintiff-friendly City HRL standard discussed above, defendant showed that plaintiff failed to adduce a sufficient quantum of evidence to allow a reasonable jury to conclude either that defendant's nondiscriminatory reason for firing her was pretextual or that discrimination otherwise played a role in defendant's decision to discharge her; therefore, summary judgment dismissing her claim of discriminatory discharge is warranted.

Defendant submitted evidence—essentially undisputed by plaintiff—of a legitimate, nondiscriminatory reason for firing plaintiff. As the motion court explained, defendant had been warning plaintiff for years that her conduct was unacceptable. This conduct included "insubordination, disrespect of her supervisors, and failure to communicate." The record contains written documentation of multiple warnings to plaintiff about

the Federal Rules of Civil Procedure—pleading facts sufficient to state a claim—the burden-shifting framework specific to title VII under *McDonnell Douglas Corp. v Green* (411 US 792 [1973]) means that pleading in those cases need not be targeted to the ultimate question of discriminatory intent but "only give plausible support to a minimal inference of discriminatory motivation" (795 F3d at 311). Here, too, the application of a general procedural rule is dependent on the distinct requirements of a particular cause of action.

4. There is no question that termination is an "adverse action," so we recognize that the discussion in the motion court's decision about what constitutes an adverse action is dicta. We note, however, that, of the two cases cited by the motion court, one (*Messinger v Girl Scouts of U.S.A.*, 16 AD3d 314 [1st Dept 2005]) was decided before the 2005 Local Civil Rights Restoration Act (Local Law No. 85 [2005] of City of New York [Restoration Act]) came into effect, and the other (*Matter of Block v Gatling*, 84 AD3d 445 [1st Dept 2011], *lv denied* 17 NY3d 709 [2011]) did not engage in the analysis required by the Restoration Act. We note here only that (a) the text of the New York City Human Rights Law does not set forth a requirement that an adverse action be "materially" adverse; and (b) it is easy to imagine circumstances where an action would be adverse in a manner contrary to the City HRL, even where one's salary and many job responsibilities remain the same.

her conduct, and documentation, including emails from plaintiff, that illustrate an ongoing struggle, apparently unrelated to race, as to whether and from whom plaintiff was going to accept direction. Indeed, one of the most striking things about the record is that it conveys an unusual willingness on defendant's part to continue working with an employee who was repeatedly insubordinate and disruptive of the workplace. Therefore, defendant met its initial burden of providing a legitimate explanation for terminating plaintiff's employment.

Plaintiff had the opportunity to submit evidence to suggest that defendant's reason for terminating her was false, misleading, or incomplete. She argues that (1) an affidavit by her former coworker and (2) the use of what plaintiff characterizes as racially "coded language" by her supervisors sufficiently call into question defendant's reason for firing her. However, as discussed below, the affidavit is not probative of pretext, and plaintiff failed to offer any evidence from which a reasonable jury could conclude that the language used by her supervisors was coded language.

In denying the part of defendant's motion seeking summary judgment dismissing the cause of action for discriminatory discharge, the motion court relied principally on an affidavit submitted on plaintiff's behalf by a supervisor who also worked for defendant (in a different department) during part of the period in question. Portions of that affidavit relate to evaluation procedures, which are not a material issue in the case. Nothing about the evaluation procedures is even vaguely suggestive of discrimination. The procedures did not and could not change the underlying and uncontested reality: Defendant consistently found (and told plaintiff) that her performance was deficient, principally because of her repeated disrupting of the workplace by being insubordinate and otherwise. Plaintiff herself confirms that she was repeatedly warned.

The affiant praised the quality of plaintiff's work, yet this does not avail plaintiff. If defendant had grounded its action (in whole or in part) on deficiencies in plaintiff's technical performance, then the averments of a person with knowledge of and respect for plaintiff's technical skill would have constituted pretext evidence. However, defendant was very clearly *not* complaining about plaintiff's technical performance. Defendant's problem was with plaintiff's insubordination and disruptive behavior.

The affiant also said that she did not witness incidents of the type that defendant complained of. This statement does not avail plaintiff. If defendant had relied on events that had allegedly occurred in the affiant's presence, and the affiant denied that those events had occurred, then her statement would have been evidence of pretext. But the affiant was not privy to the alleged events, so her failure to observe them does not contradict defendant's account or indicate pretext. Thus, the motion court erred in finding that the affidavit created a factual issue as to pretext or racial motivation in plaintiff's termination.

Plaintiff also failed to raise an issue of fact as to whether her supervisors' use of the phrase a "leopard does not change its spots" or the term "tirade" amounted to racially coded language. It is true that discrimination seldom announces itself openly (*see Vega v Hempstead Union Free Sch. Dist.*, 801 F3d 72, 86 [2d Cir 2015], quoting *Robinson v 12 Lofts Realty, Inc.*, 610 F2d 1032, 1043 [2d Cir 1979] ["As we have recognized, 'clever men may easily conceal their motivations' "]). For that reason, it is important that discrimination plaintiffs be permitted to present a wide range of indirect evidence of discrimination, including the fact that a defendant (or its agent or employee) used coded language, that is probative of discriminatory intent.[5] While some language is unmistakably reflective of the presence of race or other protected class status in the mind of the

5. It is often said that discriminatory "animus" must be shown, but it is only intent to discriminate—to act "because" of race or other protected factor—that is required (*see Goodman v Lukens Steel Co.*, 482 US 656, 668-669 [1987] [liability for intentional discrimination under title VII of the Civil Rights Act of 1964 and 42 USC § 1981 requires only that decisions be premised on race, not that they be motivated by racial hostility or animus], *superseded on statute of limitations grounds Jones v R. R. Donnelley & Sons Co.*, 541 US 369 [2004]). The City HRL's construction provision, of course, operates as a "one-way ratchet," by which interpretations of state and federal civil rights statutes can serve only "as a *floor* below which the City's Human Rights law cannot fall" (*Loeffler v Staten Is. Univ. Hosp.*, 582 F3d 268, 278 [2d Cir 2009], quoting Restoration Act § 1). An "animus" requirement is not supported by statutory language or by legislative history. Whether a defendant is motivated by animus, or misguided benevolence, or some other consideration, the conduct in question is illegal so long as it was (at least in part) *because of* protected class status and operated to the disadvantage of the plaintiff. Thus, for example, a company vice president may think fondly of older employees even as that vice president is explaining that it is "time for new blood"; that fondness does not take away from the fact that the phrase suggests that it is time for older workers to move on and that any decision to fire older workers may have been based on their age (*cf. Melman v Montefiore Med. Ctr.*, 98 AD3d 107, 125-126 [1st Dept 2012]).

speaker, in many other cases meaning is context-dependent, as the motion court correctly pointed out. It is not enough, however, to state that meaning is context-dependent. A court considering a motion for summary judgment must actually examine the statement, and in some cases its historical usage, in addition to the context in which it is used (*see Ash v Tyson Foods, Inc.*, 546 US 454, 456 [2006] ["(A) speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage"]). If a defendant moving for summary judgment fails to prove that no reasonable jury could conclude that the statement in context was coded racial language, then summary judgment must be denied.[6] Conversely, if a plaintiff fails to offer evidence that could lead a reasonable jury to conclude that the statement in context actually reflected the speaker's use of the language in a racially coded manner, then summary judgment must be granted to defendant. Such is the case before us.

The most significant language in question is the colloquial expression, "A leopard does not change its spots." The record contains two emails in which plaintiff's supervisors used some variation of this expression. Plaintiff points out that, at the turn of the twentieth century, the phrase was used in a racist fashion in a novel by Thomas Dixon, Jr. (The Leopard's Spots [1902]) and in a Joseph Rudyard Kipling tale (Just So Stories, *How the Leopard Got his Spots* [1901]). However, plaintiff offered no evidence from which to infer that the expression is imbued with racial meaning in contemporary parlance. In fact, today it is commonly understood to mean that a person's pattern of behavior tends not to change (*see* Random House Dictionary of America's Popular Proverbs & Sayings 201 [2d ed 2006] ["Human nature is as fixed and unchanging as the spots on a leopard's skin"]; The American Heritage Dictionary of Idioms 265 [2d ed 2013]). The racially derogatory meaning the expression "a leopard does not change its spots" may have had more than 100 years ago is too attenuated, without more, to permit a discriminatory meaning to be imputed to a speaker whenever the expression is uttered today.

In any event, on the evidence in the record, defendant's use of the language in reference to plaintiff is only consistent with the view, frequently expressed by defendant's employees and having no apparent reference to race whatsoever, that plaintiff

---

**6.** Even if such a comment is a "stray" remark, it can provide a window into what is motivating the speaker and thus create an issue of fact for a jury (*cf. Melman*, 98 AD3d at 125).

was someone who, when faced with criticism or discipline, would reflexively argue that she was being treated unfairly or unjustly. A jury could not reasonably conclude that plaintiff's supervisors intended to employ the phrase in a racially charged manner.[7]

The other term on which plaintiff relies, "tirade," is even less probative of pretext, since unlike the "leopard's spots" expression it has no historically racial meaning and is entirely race-neutral (see Merriam-Webster Online Dictionary, tirade [http://www.merriam-webster.com/dictionary/tirade] [defined as "a protracted speech usually marked by intemperate, vituperative, or harshly censorious language"]). Plaintiff's supervisors used the term in several emails and in a memorandum to her employee file; they also used the terms "outbursts" and "hostile and insubordinate behavior," with which plaintiff does not take issue. There is nothing to suggest that "tirade" was used in reference to her race.

Since plaintiff failed to carry her burden of creating a factual issue as to whether defendant's nondiscriminatory reason for its decision to terminate her was pretextual or whether its decision was based, at least in part, on race, we reverse the order of the motion court insofar as it denied defendant summary judgment dismissing the discriminatory discharge claim.

3. Retaliation

To make out a prima facie case of retaliation under the City HRL, plaintiff was required to show that "(1) [she] participated in a protected activity known to defendant[ ]; (2) defendant[ ] took an action that disadvantaged [her]; and (3) a causal connection exists between the protected activity and the adverse action" (Fletcher v Dakota, Inc., 99 AD3d 43, 51-52 [1st Dept 2012]).

Plaintiff was fired in May 2009. Her claim is that she was fired in retaliation for having filed an internal complaint of racial discrimination in August 2008. But she offered no evidence of a causal connection. In fact, whether one considers the matter from defendant's point of view (plaintiff's improper conduct) or from plaintiff's point of view (improper supervision by various of defendant's personnel), all the discord—in scope, kind, and frequency—preexisted her internal complaint. The discharge that was effected in 2009 was the culmination of

---

7. This is not the circumstance, therefore, where a court is obliged to refrain from deciding between two competing narratives, each of which a reasonable jury could credit, even if one is stronger than the other.

continuous progressive discipline (*see Koester v New York Blood Ctr.*, 55 AD3d 447, 449 [1st Dept 2008] [where "termination followed more than a year of progressive disciplinary complaints . . . (,) the temporal proximity between plaintiff's (internal discrimination) complaint and defendant's adverse action (was) alone insufficient to support a claim of retaliatory discharge"]).

■ It is certainly true that a complaint of discrimination could be the "extra factor" that pushes an employer from a posture of dissatisfaction with an employee to a determination to discharge the employee, and so an employer cannot avoid scrutiny of its post-complaint conduct by virtue of having begun to discipline an employee pre-complaint. But the evidence is abundant and uncontroverted that, before plaintiff made her internal complaint, she was hanging on by a thread, and that she was still employed only because defendant, far from conspiring to get rid of her, continued to try to see if she could be made to understand what was required of her. After plaintiff made the complaint, the same type of conduct that had previously produced final warnings and poor evaluations continued. A reasonable jury could not conclude that any causal connection existed between plaintiff's internal complaint and her discharge.

Conclusion

Accordingly, the order of the Supreme Court, New York County (Jeffrey K. Oing, J.), entered October 9, 2014, which, insofar as appealed from, denied defendant's motion for summary judgment dismissing the cause of action for discriminatory discharge, and granted the motion as to the cause of action for retaliation, should be modified, on the law, to grant the motion as to the cause of action for discriminatory discharge, and otherwise affirmed, without costs. The Clerk is directed to enter judgment dismissing the complaint.

Tom, J.P., Andrias and Moskowitz, JJ., concur.

Order, Supreme Court, New York County, entered October 9, 2014, modified, on the law, to grant motion as to the cause of action for discriminatory discharge, and otherwise affirmed, without costs. The Clerk is directed to enter judgment dismissing the complaint.