[62 NYS3d 26]

CAROLE HAMBURG, M.D., Appellant-Respondent, v NEW YORK UNIVERSITY SCHOOL OF MEDICINE et al., Respondents-Appellants.

First Department, September 26, 2017

**APPEARANCES OF COUNSEL**

*Law Offices of Michael G. Berger*, New York City (*Michael G. Berger* of counsel), for appellant-respondent.

*Zachary W. Carter, Corporation Counsel*, New York City (*MacKenzie Fillow* and *Pamela Seider Dolgow* of counsel), for respondents-appellants.

**OPINION OF THE COURT**

FRIEDMAN, J.P.

In this action for age discrimination in violation of the New York City Human Rights Law (NYCHRL) (Administrative Code of City of NY § 8-107 [1] [a]) and for breach of contract, plaintiff, a former member of the radiology department of defendant medical school and hospital, challenges defendant's decision not to renew her employment at the expiration of the term of her last appointment. Although Supreme Court assumed (as do we) that plaintiff carried her "de minimis" burden of establishing a prima facie case of age discrimination (*see Bennett v Health Mgt. Sys., Inc.*, 92 AD3d 29, 38 [1st Dept 2011], *lv denied* 18 NY3d 811 [2012]), the court correctly determined that plaintiff, in response to defendant's evidence of legitimate, nondiscriminatory reasons for the challenged employment action, failed to present any evidence raising a triable issue as to whether bias against employees of her age played a role in that decision (*see id.* at 40).

As more fully discussed below, defendant established that the nonspecialized section of the radiology department in which plaintiff worked, which produced no research, was phased out as part of a restructuring of the department, at a time of financial constraint, to achieve greater focus on the specialized, research-producing sections of the department. Defendant further established that, as part of this restructuring, it retained three physicians from plaintiff's section, each of whom was of approximately the same age as plaintiff (60), and reassigned them to specialized departments. Plaintiff, however, was reasonably deemed to lack the specialized expertise and the proclivity for research that defendant deemed necessary to maintain its status as a top-tier academic radiology department. Not only did plaintiff fail to present any evidence casting doubt on this explanation, she failed to present any evidence, either direct or circumstantial, suggesting that bias against employees of her age was even a partial motive for the ending of her employment.

While we affirm the dismissal of the age discrimination claim, we modify to grant defendant summary judgment dismissing the claim for breach of contract, as well. As more fully discussed below, the faculty handbook setting forth the

terms of plaintiff's employment, when construed as a whole, requires a year's notice of nonrenewal of employment only for faculty members (beyond their second year of service) holding tenure-eligible appointments. Since plaintiff admits that she was not eligible for tenure, her claim for breach of contract— based on defendant's having given her advance notice of eight months, rather than a full year, of the end of her employment—is legally insufficient as a matter of law.

Plaintiff Carole Hamburg, M.D., who was born in 1950, is a board-certified radiologist. In the summer of 2002, defendant New York University School of Medicine (NYU) hired plaintiff as an "Assistant Professor (Clinical) of Radiology" and as a member of the radiology department of NYU-affiliated hospitals.[1] As stated in NYU's letters offering the position to plaintiff, the appointment was for a one-year term that would be "renewable upon agreement of both parties," and was subject to the terms of the NYU faculty handbook and the hospital bylaws. Over the nine years following her initial appointment in 2002, NYU periodically renewed plaintiff's appointment. Each reappointment was for a defined period of one or two years.

It is undisputed that plaintiff's position at NYU was never eligible for academic tenure.[2] Stated otherwise, plaintiff's position at NYU was one that could never lead to tenure, no matter how many times she was reappointed. Plaintiff admits that she understood this at all relevant times.

---

**1.** The academic and hospital appointments were components of the same position. Although plaintiff has also named "New York University Langone Medical Center" as a defendant, NYU explains that this is not the name of a separate legal entity that can be sued.

**2.** The 2008 NYU faculty handbook describes tenure at the institution as follows:

> "After expiration of the stipulated probationary periods [for tenure-eligible positions], full-time associate professors and professors [sic] are considered to have permanent or continuous tenure, and their services are to be terminated only for adequate cause, except in the case of retirement, or under extraordinary circumstances because of financial exigencies, or because of the discontinuance of a considerable part of the University, such as a college, school, or division or a department in a college, school, or division."

Regarding the purpose of tenure, the handbook states: "Academic tenure is a means to certain ends, specifically: (1) freedom of teaching and research; and (2) a sufficient degree of economic security to make the profession of teaching attractive to men and women of ability."

Throughout her employment at NYU, plaintiff was assigned to the "General Diagnostic Radiology section" (hereinafter, general radiology) of NYU's radiology department. By her own account, plaintiff's primary responsibility in general radiology was "reading plain films"—X rays without contrast—"[f]or any part of the body." As plaintiff stated at her deposition, "I was the designated plain film person." Notwithstanding her academic title, plaintiff did not conduct any research or publish any papers during her employment by NYU, nor did she teach or supervise medical students, residents or fellows. Her involvement in medical education at NYU was limited to informal "mentoring" of a handful of medical students and to interviewing medical school applicants.

In addition to general radiology, the NYU radiology department included several more specialized sections. Among the specialized sections of the department were sections respectively focusing on cardiac imaging, abdominal imaging, musculoskeletal imaging, thoracic (chest) imaging, neuroradiology, pediatric radiology, vascular interventional radiology, neuro-interventional radiology, and nuclear medicine. The specialized sections produced original research relevant to their respective practice areas, but general radiology—the section in which plaintiff worked—produced no research.

In November 2008, Dr. Michael Recht assumed the chair of NYU's radiology department. In discussions that began in 2009, Dr. Recht and his leadership team (which did not include plaintiff) identified as a departmental goal the maximization of the department's production of research, so as to maintain its standing as (in Dr. Recht's words) "one of the best academic radiology departments." The realization of this goal was complicated by the financial pressure under which the department was operating as the result of reductions in Medicare reimbursement rates for its clinical services. As Dr. Recht expressed it at his deposition: "Because we didn't have unlimited revenue, and in fact, our revenue for the exams that we were doing was shrinking, we needed to make very tough decisions to make sure we were set up correctly to thrive, survive and thrive [sic], in the future of radiology."

Given the goal of increasing the department's production of research under conditions of financial constraint, Dr. Recht and his team began to consider (in Dr. Recht's words) "[w]hether . . . [a] section of general radiology was something . . . that an academic radiology department should have or not have."

These deliberations resulted in Dr. Recht's determination that the general radiology section, because it was not producing any research, "was not appropriate for our department," and should be eliminated over time. As Dr. Recht explained, "My goal for the department was not to be a good general radiology department . . . [but] to be a sub-specialized academic radiology department at the cutting edge of radiology clinical care, education and research." Accordingly, it was decided that certain physicians in general radiology would be absorbed into the department's specialized sections, while the appointments of other physicians in the section would not be renewed as their terms expired. Ultimately, the work performed in general radiology would be absorbed by the department's specialized sections.

At the time Dr. Recht decided to phase out general radiology, 10 physicians (including plaintiff) were working in the section. In consultation with the heads of the specialized sections, Dr. Recht determined that three general radiology physicians had the appropriate experience and skills to be reassigned to the specialized sections. It is undisputed that all three of these retained physicians—one of whom was assigned to thoracic imaging, the other two to abdominal imaging—were, like plaintiff, around 60 years of age in 2011. The appointments of six other physicians in general radiology—including plaintiff's—were not renewed as their respective terms ended. Of the six general radiology physicians whose appointments were not renewed as the section was phased out, one was in his late 30s or early 40s, two (including plaintiff) were around 60, one was in his late 60s, and the three others were 80 or older.[3]

Plaintiff's last appointment at NYU was for the 2010-2011 academic year. On May 3, 2011, Dr. Recht met with plaintiff in his office and informed her that NYU would not be renewing her contract, although, as a matter of courtesy, her employment would be extended until December 31, 2011. Dr. Recht testified that he told plaintiff at this meeting that her contract was not being renewed "because of the changes in the department . . . and that in order to be fair and give her as much time as possible, I was letting her know as early as I could, once the decision was made, so that she would have eight

---

**3.** It appears from the record that a tenth general radiology physician, the former head of the section, retired in January 2013, when he was in his late 70s. This physician's departure from NYU is not discussed by either party on this appeal, so we will not consider it in our analysis.

months to adjust to that and move forward."[4] Plaintiff, in her affidavit, states that Dr. Recht told her at the meeting that the reason for the nonrenewal was that "the Radiology Department was placing greater emphasis on research and had to maintain revenue." Subsequently, by letter dated October 14, 2011, Dr. Recht confirmed to plaintiff in writing that, "[a]s discussed in our meeting of May 3, 2011, due to operational changes in the Department of Radiology, your contract is not being renewed effective December 31, 2011."[5]

At the end of her employment by NYU, plaintiff was working three days a week (although her position was classified as full time) at Gouverneur Health Care Service, where, as previously noted, she principally interpreted "plain film" X rays.[6] After plaintiff left NYU at the end of 2011, the work she had been doing at Gouverneur was absorbed by Dr. Jodi Cohen, a member of the musculoskeletal imaging section who had been at NYU since 2006. At his deposition, Dr. Recht estimated that Dr. Cohen, whose credentials included a fellowship in musculoskeletal radiology, was in her 40s.

In June 2012, plaintiff commenced this action against NYU, in which she asserts two causes of action, the first for age discrimination in violation of the NYCHRL and the second for breach of contract. After discovery was conducted, NYU moved for summary judgment dismissing the complaint. Supreme Court granted NYU summary judgment dismissing the cause of action for age discrimination, but denied the motion as to the breach of contract cause of action. Plaintiff and NYU each appeals from this order to the extent each is aggrieved thereby.

■ We turn first to the cause of action for age discrimination in violation of the NYCHRL. As this Court has held, a defense motion for summary judgment in an action brought under the NYCHRL must be analyzed under both the familiar framework of *McDonnell Douglas Corp. v Green* (411 US 792 [1973]) and

---

4. According to an affidavit submitted by Dr. Recht, "It is the practice in the [NYU] School of Medicine to provide three months' notice of non-renewal of non-tenure eligible faculty where practicable."

5. At his deposition, Dr. Recht, in explanation of the five-month gap between the May 3 meeting and the October 14 letter, testified that, at that time, "when we didn't renew people's contracts, we gave them the option of resigning rather than sending them a formal letter if they felt that would be better for their future opportunities."

6. At the relevant time, NYU provided certain medical staffing at Gouverneur and at Bellevue Hospital pursuant to an affiliation agreement with the New York City Health and Hospitals Corporation.

under the newer "mixed motive" framework, which imposes a lesser burden on a plaintiff opposing such a motion. Summary judgment dismissing a claim under the NYCHRL should be granted only if "no jury could find defendant liable under any of the evidentiary routes—*McDonnell Douglas*, mixed motive, 'direct' evidence, or some combination thereof" (*Bennett*, 92 AD3d at 45).

The *McDonnell Douglas* framework and the mixed motive framework diverge only after the plaintiff has established a prima facie case of discrimination (as more fully described below) and the defense has responded to that prima facie case by presenting admissible evidence of "legitimate, independent, and nondiscriminatory reasons to support its employment decision" (*Forrest v Jewish Guild for the Blind*, 3 NY3d 295, 305 [2004] [internal quotation marks omitted]). At that point, under *McDonnell Douglas*, the burden shifts to the plaintiff to produce evidence tending to "prove that the legitimate reasons proffered by the defendant were merely a pretext for discrimination" (*id.*).[7] By contrast, under the mixed motive analysis, the plaintiff may defeat the defendant's evidence of legitimate reasons for the challenged action by coming forward with evidence from which it could be found that "unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for [the] adverse employment decision" (*Melman v Montefiore Med. Ctr.*, 98 AD3d 107, 127 [1st Dept 2012]). Combining the two approaches, where the plaintiff has made out a prima facie case of discrimination, he or she may defeat a defense summary judgment motion based on evidence of a legitimate, nondiscriminatory reason for the adverse action by coming forward either with evidence that "the [defendant's] stated reasons were false and that discrimination was the real reason" (*Forrest*, 3 NY3d at 305) or with evidence that "discrimination was one of the motivating factors for the defendant's conduct" (*Williams v New York City Hous. Auth.*, 61 AD3d 62, 78 n 27 [2009], *lv denied* 13 NY3d 702 [2009]).

As previously noted, the first step in both the *McDonnell Douglas* analysis and the mixed motive analysis is to determine whether plaintiff has met her burden of establishing a prima facie case of discrimination.

---

7. Of course, to withstand a summary judgment motion, a plaintiff is not required to prove pretext, but need only demonstrate the existence of a genuine and material disputed issue of fact as to whether the defendant's stated reasons for the adverse action were pretextual (*see Ferrante v American Lung Assn.*, 90 NY2d 623, 630 [1997]).

"To meet this burden, plaintiff must show that (1) she is a member of a protected class; (2) she was qualified to hold [her] position; (3) she was terminated from employment or suffered another adverse employment action; and (4) the discharge or other adverse action occurred under circumstances giving rise to an inference of discrimination" (*Forrest*, 3 NY3d at 305).

Here, it is undisputed that plaintiff has established the first three elements of a prima facie case of discrimination (membership in a protected class, possession of qualifications for the position, and having suffered an adverse employment action). Plaintiff argues that she has also satisfied the fourth element—a showing of circumstances giving rise to an inference of discrimination—in that, as she testified at her deposition, "the people [in general radiology] that were terminated in addition to me were all of a similar age and the person that sat at my desk after I left was in her late 30's [sic], early 40's [sic]."[8] While NYU does not concede that plaintiff has demonstrated circumstances giving rise to an inference of discrimination, it does not emphasize this point. Supreme Court, although it ultimately dismissed the claim under the NYCHRL, assumed that plaintiff had made out a prima facie case of discrimination, a standard that is, after all, "de minimis" (*Bennett*, 92 AD3d at 38). Accordingly, we, like Supreme Court, assume for purposes of plaintiff's appeal that she has met her burden of establishing a prima facie case of discrimination.

The next step in the analysis, under both *McDonnell Douglas* and the mixed motive framework, is to determine whether NYU has come forward with evidence of "legitimate, indepen-

---

**8.** As previously noted, one general radiology physician whose contract was not renewed, apparently at some point before the end of 2010, was in his late 30s or early 40s. While plaintiff alleges that she understood that the departure from NYU of this physician (to whom we will refer as FL) was related to a disciplinary issue, she admitted that she had no personal knowledge of the matter, and she has not presented any admissible evidence concerning the reason for FL's departure. However, Dr. Recht's testimony about the reason for FL's departure was not entirely clear. Dr. Recht testified that, contrary to plaintiff's understanding, FL's departure "was not related to a disciplinary event." At one point, Dr. Recht characterized FL's departure as a "dismissal," but, at another point, he characterized the departure as "his [FL's] decision not to renew his contract," suggesting that the departure was voluntary. Since Dr. Recht, the only witness with personal knowledge of this matter who addressed it in the record, arguably contradicted himself concerning the reason for FL's departure, we regard FL's departure as a neutral factor in deciding this appeal.

dent, and nondiscriminatory reasons to support its employment decision" (*Forrest*, 3 NY3d at 305 [internal quotation marks omitted]). NYU has set forth, through admissible evidence, a legitimate and nondiscriminatory reason for its decision not to renew her appointment. Dr. Recht, the chairman of NYU's radiology department, testified that he decided to phase out the general radiology section in which plaintiff worked as part of a strategic shift of the department's resources to the research-producing specialized radiology sections. Dr. Recht testified that this restructuring was motivated by his view that a top-tier academic radiology department should focus on the production of original medical research and, in the face of decreasing revenues, could not afford to support a nonspecialized general radiology section, the members of which did not conduct research. Three general radiology physicians who had specialized skills—all of whom were, like plaintiff, around 60 years old at the time—were absorbed into the specialized sections. The appointments of those without such skills were not renewed.

Dr. Recht explained during his deposition that, as the chair of the radiology department, he was charged with determining how to use the limited revenue available to the department to maximize its potential and fulfill its mission of advancing medical science through the production of research. After numerous meetings with his leadership team, he concluded that the optimal use of the revenue from the department's clinical services was to employ radiologists with specialized skills who would produce research. At his deposition (as clarified in his subsequent affidavit correcting a transcription error), Dr. Recht summarized his reasoning as follows:

> "[Plaintiff] . . . and the other general radiologists, since we were eliminating the general radiology section, we were able to use that revenue [from reading film] to hire people in the appropriate subspecialty sections that would allow us to increase . . . our subspecialization as well as our research output."

Stated otherwise, while plaintiff's performance as an interpreter of plain film was satisfactory, retaining her would have diverted the radiology department's resources from the specialized, research-oriented direction that its management had selected. As Dr. Recht put it at the conclusion of his deposition, "If I use that revenue [from reading film] in Bucket A, I have

less revenue for Bucket B"—"Bucket A" being "general radiology" and "Bucket B" being "a subspecialty-trained radiologist who is doing academic work."

Upon NYU's submission of a legitimate, nondiscriminatory reason for its decision not to renew plaintiff's contract, the burden shifted back to plaintiff to come forward with evidence raising a triable issue as to whether, under *McDonnell Douglas*, NYU's explanation was a false pretext masking discriminatory intent (*see Forrest*, 3 NY3d at 305), or whether, under the mixed motive analysis, NYU's decision was motivated, at least in part, by discriminatory bias (*see Williams*, 61 AD3d at 78 n 27). Supreme Court correctly determined that plaintiff failed to carry this burden.[9]

Initially, we note that, as plaintiff essentially concedes, she has no direct evidence that the actions she challenges were taken with discriminatory intent, nor does she have any evidence of bias against older employees on the part of the leadership of the NYU radiology department. Plaintiff admits that she does not recall Dr. Recht or any member of his leadership team ever writing or saying anything that could be interpreted as revealing, either intentionally or inadvertently, the existence of such bias (*cf. Ferrante*, 90 NY2d at 626 [the employer was not entitled to summary judgment where the plaintiff alleged that his supervisor "disparaged and humiliated (him) by calling him 'the old man' "]; *Krebaum v Capital One, N.A.*, 138 AD3d 528, 528 [1st Dept 2016] [same, where the plaintiff allegedly "endured repeated negative comments about his age from his manager"]). Indeed, plaintiff does not claim even to have heard secondhand reports or rumors of such comments. Accordingly, we turn to the circumstantial evidence on which plaintiff relies.

In arguing that the reasons given by NYU for the nonrenewal of her contract are pretextual—or, at a minimum, tainted

---

9. Contrary to plaintiff's contention, Supreme Court did not erroneously require her to prove her claim. Rather, the court appropriately required plaintiff to demonstrate the existence of an issue of fact that, if resolved in her favor, would prove her case, under either standard. Nor did the court inappropriately weigh the credibility of Dr. Recht's deposition testimony, which was the principal evidence on which NYU relied. Plaintiff cannot defeat a well-supported summary judgment motion, without identifying any evidence (either direct or circumstantial) from which it could rationally be inferred that bias played a role in the nonrenewal of her contract, merely by contending that she might persuade a jury not to believe Dr. Recht's testimony. If that were the case, no summary judgment motion could ever be granted in a discrimination case.

by an admixture of bias against older employees—plaintiff relies heavily on the fact that, of the six general radiology physicians who were not reappointed as the section was phased out, five were 60 or older when advised that they would not be reappointed.[10] This overlooks, however, that all three physicians in the section who were retained and reassigned were, like plaintiff, about 60 years old at the time. Absent evidence that younger physicians of equal or lesser qualifications than plaintiff's received more favorable treatment than she did, the retention of three physicians of essentially the same age as plaintiff completely negates any possible inference that the nonrenewal of plaintiff's contract was based, in whole or in part, on bias against people of her age cohort.

In this regard, entirely beside the point is plaintiff's argument that her qualifications for transfer to a specialized section, and her ability to perform research, were comparable to, or better than, those of the three physicians who were retained. Since it is undisputed that there was no significant age difference between plaintiff and any of the three retained physicians, no inference of invidious discriminatory intent may be drawn from NYU's choice to retain those three rather than plaintiff.[11] In the absence of any significant age difference among the four physicians in question, NYU's assessment that each of the three retained physicians was better suited than plaintiff to joining one of the radiology department's specialized sections was a business judgment not subject to judicial second-guessing (*see Forrest*, 3 NY3d at 312 [in a discrimination case, it was not "material whether defendants' contemporaneous assessment of plaintiff's . . . skills was justified"]; *Baldwin v Cablevision Sys. Corp.*, 65 AD3d 961, 966 [1st Dept 2009] [a court hearing a discrimination suit "should not sit as a super-personnel department that reexamines an entity's business decisions" (internal quotation marks omitted)], *lv denied* 14 NY3d 701 [2010]; *Bailey v New York Westchester Sq. Med. Ctr.*, 38 AD3d 119, 124 [1st Dept 2007] [in a discrimination case, an attack on the employer's business judgment "does not give rise to the inference that the employee's discharge was due to age discrimination" (internal quotation marks omitted)]).

---

**10.** Again, we regard the nonrenewal of the contract of the sixth physician, the aforementioned FL, the younger section member, as a neutral factor in deciding this appeal, as discussed in footnote 7 above.

**11.** Plaintiff does not allege that NYU discriminated against her on any basis other than age.

Plaintiff argues further that an inference of age discrimination against her may be drawn from the fact that four other general radiology physicians, whose contracts were not renewed in connection with the elimination of the section, were, like plaintiff herself, members of the protected class of older workers. However, as previously noted, each of these four physicians was significantly older than plaintiff (again, one was in his late 60s, the other three were 80 or older). In view of the retention of all of the general radiology physicians in plaintiff's age cohort, other than plaintiff herself, the nonrenewal of the contracts of the four significantly older physicians gives rise to no inference that the decision not to reappoint *plaintiff* was influenced by bias against employees of *her* age. Moreover, since plaintiff has presented no statistical data or analysis to show that the NYU radiology department declined to reappoint older physicians at a higher rate than younger physicians during the relevant period, the fact that plaintiff and four significantly older general radiology physicians were not reappointed (while three other physicians of plaintiff's own age were retained) provides no basis for a finding of a pattern of age discrimination (*see Melman*, 98 AD3d at 124-125).[12]

Also unavailing is plaintiff's argument that a discriminatory motive may be inferred from the fact that, after she left NYU, her functions at Gouverneur were assigned to a younger physician, Dr. Jodi Cohen, who, according to Dr. Recht's testimony, was in her 40s. To begin, Dr. Cohen was not hired to replace plaintiff; she had been working in the radiology department since 2006, and was a member of the musculoskeletal section, having completed a fellowship in that field. The thrust of plaintiff's argument appears to be that NYU, consistent with its stated goal of shifting the radiology department's resources to the specialized, research-producing sections, could just as well have reassigned plaintiff to the musculoskeletal section, rather than let her go and reassign her duties to Dr. Cohen, since plaintiff possessed sufficient credentials to participate in medical research (although she had never done so since joining

**12.** NYU directs our attention to record evidence that, during the period from December 31, 2010 through early 2015, of the nine radiology department physicians who were not reappointed, four were in their 40s, two were in their 60s (including plaintiff), and three were in their 80s. While the rates of reappointment for physicians of different ages during the period cannot be determined from this limited data set, the information certainly provides no support for plaintiff's theory that NYU discriminated in favor of younger physicians.

NYU in 2002) and had practical experience in reading musculoskeletal images.[13] However, NYU was entitled, in the exercise of its academic judgment, to deem plaintiff's practical experience insufficient to warrant reassigning her to the musculoskeletal section, or any of the other specialized sections, and, after she left, to reassign her work to a member of one of the specialized sections. Plaintiff has not offered any competent evidence to controvert the good faith of this exercise of NYU's academic judgment.[14]

Given the NYU radiology department's phasing out of general radiology, the work that had previously flowed to that section had to be redistributed to the specialized sections. No inference of discriminatory intent, whether as sole or partial motive, arises from the fact that, in one instance (and that is all that plaintiff has shown), the work previously done by an older employee (plaintiff), whose employment ended due to the elimination of her section in a restructuring, was redirected to a younger employee (Dr. Cohen) in one of the remaining sections. Certainly, no such inference can be drawn against the employer where, as here, it reasonably deemed the younger employee to possess needed specialized expertise that the older employee lacked.[15]

---

**13.** We note that plaintiff completed a fellowship in nuclear medicine early in her career, apparently more than 30 years before NYU determined not to reappoint her. Plaintiff does not, however, suggest that she should have been reassigned to the radiology department's nuclear medicine section, or that her fellowship credential otherwise should have been considered by NYU in determining whether to renew her contract in 2011.

**14.** Dr. Recht testified: "[T]oday if you want to be considered an expert, you need to do a fellowship." Dr. Recht also testified: "If you're asking me do I think [plaintiff] was qualified to be a member of a top-level academic musculoskeletal radiology section, I would answer no." Plaintiff's self-serving but unsupported assertion in her affidavit that her clinical experience had given her "more extensive training in musculoskeletal radiology than any fellowship could provide" does not create a jury issue. Also unavailing is plaintiff's reliance on her testimony that NYU did not honor her requests to be assigned to duties other than reading plain film, such as interpreting ultrasound images. Dr. Recht testified that it was plaintiff's lack of interest in research and lack of relevant specialized credentials, rather than the type of images she was reading, that led to the decision not to reappoint her.

**15.** Plaintiff cites *Ashker v International Bus. Machs. Corp.* (168 AD2d 724 [3d Dept 1990]) for the proposition that, where an older employee's position has been eliminated, the redistribution of her work to a younger, preexisting employee can support a claim for age discrimination. In *Ashker*, however, the elimination of the plaintiff's position was not part of an overall restructuring of the enterprise, and the appeal was taken from a pre-discovery motion to dismiss (*see id.* at 726). Accordingly, *Ashker* is inapposite.

Plaintiff also relies on announcements she received by email, in late 2010 and 2011, of the radiology department's hiring of a number of apparently younger physicians. Plaintiff overlooks, however, that each announcement states that the newly hired physician had completed a fellowship in a specialized area of radiology and, unlike plaintiff during her years with NYU, had developed defined areas of active research interest. Plaintiff does not dispute the accuracy of these statements. Thus, the hiring of these physicians was consistent with NYU's stated goal of shifting the department's focus to the research-producing specialized sections and, therefore, does not give rise to an inference of discriminatory intent.[16]

Plaintiff directs our attention to certain evidence in the record that, she argues, put in question NYU's explanation that the nonrenewal of her contract was motivated by a desire to shift the radiology department's focus to research. Thus, plaintiff points to her testimony that, before the May 2011 meeting at which she was told that she would not be reappointed, neither Dr. Recht nor any other departmental leader had ever asked her to involve herself in research or had even discussed research with her. Plaintiff states that she was qualified to participate in research and, had she been told that she was expected to produce research, she would have done so. Dr. Recht testified, however, that "we don't assign research to people" and that "most of our staff members develop their own research direction" and "come up with their own research projects," which they carry out "independently." NYU could reasonably conclude, based on plaintiff's nonparticipation in research since she was hired in 2002, that research (in Dr. Recht's words) "wasn't what she was interested in doing," and that keeping her on staff would not help to meet the department's goal of increasing the quantity and quality of the research it produced.[17]

---

**16.** Two of the announcements to which plaintiff draws attention concern the hiring of doctoral-level technology scientists, not physicians, and thus have no relevance at all to the analysis.

**17.** Nor is NYU's explanation for not reappointing plaintiff undermined by its acquisition in 2011 of a Long Island outpatient imaging group. It appears that the group continued to function on Long Island after the acquisition, thereby increasing NYU's share of the market for radiology services in the metropolitan area. Thus, the acquisition of the group, even if it produced no research (as plaintiff asserts), would have served to increase the revenue available to support research at NYU. In this regard, we emphasize that

Plaintiff's remaining arguments concerning her age discrimination claim are also unavailing. That her salary and bonuses were not reduced before her employment ended does not contradict Dr. Recht's testimony that the radiology department's revenue was under pressure, due to reduced Medicare reimbursement rates, at the time. As Supreme Court observed, it was reasonable for the department to maintain the same level of compensation for plaintiff while her employment continued even as it undertook a restructuring to address the financial strains under which it was operating. Nor is it relevant that, after plaintiff left, the department continued to perform the same kind of clinical work that she had been doing, since, as Dr. Recht testified, it better served the department's goals to have that work performed by more specialized and research-oriented radiologists, whose research would then be supported by the revenue from the clinical work. Finally, that plaintiff was given five more months of notice of the end of her employment than was the department's usual practice does not, standing alone, support an inference that the decision not to reappoint her was motivated, in whole or in part, by bias against employees of her age.

In sum, "[p]laintiff failed to raise triable issues of fact as to whether [NYU's] proffered reasons for [its] decisions were pretextual or incomplete, given the absence of any evidence from which a reasonable jury could infer that [her age] played a role in [NYU's] decision" not to reappoint her to its faculty in the context of a departmental restructuring (*Uwoghiren v City of New York*, 148 AD3d 457, 457 [1st Dept 2017]). Stated otherwise, on this record, no triable issue exists as to whether the employer, in taking the challenged action, "was motivated at least in part by age discrimination" (*Spinello v Depository Trust & Clearing Corp.*, 147 AD3d 572, 572 [1st Dept 2017]). We recognize, of course, that, under the Local Civil Rights Restoration Act of 2005, the NYCHRL is to be "construed liberally" to accomplish its "uniquely broad and remedial purpose[ ]" (Administrative Code § 8-130 [a]). This does not mean, however, that plaintiff may defeat NYU's evidentiary showing of legitimate and nondiscriminatory reasons for not reappointing her without "com[ing] forward with any evidence—either direct or circumstantial—from which it could rationally be inferred that age discrimination was a motivating factor, even in part, for

plaintiff has produced no evidence that NYU, during the relevant period, hired additional radiologists not engaged in research simply to handle NYU's preexisting stream of clinical work.

[that decision]" (*Melman*, 98 AD3d at 128). Accordingly, we affirm the grant of summary judgment dismissing the age discrimination claim.

This brings us to the cause of action for breach of contract, as to which Supreme Court denied NYU's summary judgment motion. Plaintiff alleges that NYU breached her contract by providing her approximately eight months' oral notice, and two months' written notice, that her contract would not be renewed. Plaintiff asserts that her contract entitled her to 12 months' prior written notice if her contract would not be renewed. In reply, NYU argues that plaintiff was not contractually entitled to any notice because her contract stated that her one year appointment would automatically terminate unless she received a notice of renewal, and further asserts that NYU's oral and written notice were delivered to plaintiff as a matter of professional courtesy. Plaintiff's employment agreement stated that her academic appointment as Assistant Professor (Clinical) of Radiology was governed by the NYU Faculty Handbook (the Handbook). Accordingly, the Handbook is the relevant contract. As to which sections of the Handbook apply to plaintiff's particular position, plaintiff's final reappointment letters specified that she would continue to hold the title of "Assistant Professor (Clinical) of Radiology," that she would be employed on a full-time basis, and that her appointment carried "[n]o tenure implications."

When analyzing an agreement, the "entire contract must be reviewed and particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby" (*Riverside S. Planning Corp. v CRP/Extell Riverside, L.P.*, 13 NY3d 398, 404 [2009] [internal quotation marks and brackets omitted]). Here, when the applicable contractual document—the Handbook—is viewed as a whole, we find that the provision requiring prior notice of intention not to reappoint a full-time faculty member (title II, sec XI, para 2), on which plaintiff relies, unambiguously applies only to tenure-eligible faculty members.

The structure of the relevant portions of the Handbook is illustrated by the Handbook's table of contents, which is as follows, in relevant part (page numbers omitted):

"The Faculty"

"ACADEMIC FREEDOM AND TENURE"

"Title I: Statement in Regard to Academic Freedom
and Tenure"

"Title II: Appointment and Notification of Appointment"

"Title III: Rules Regulating Proceedings to Terminate for Cause the Service of a Tenured Member . . . ."

"Title IV: General Disciplinary Regulations Applicable to Both Tenured and Non-Tenured Faculty Members"

"OTHER FACULTY POLICIES"

"Faculty Membership and Meetings"

"Faculty Titles"

In a note under the heading "The Faculty," the Handbook plainly indicates that, except where otherwise expressly provided (as in title IV), the provisions under the heading "Academic Freedom and Tenure" apply only to tenured and tenure-eligible faculty. The note states in pertinent part:

"(This part of the Faculty Handbook, The Faculty, begins under the heading Academic Freedom and Tenure with Titles I-IV of the University's *formal rules of tenure and related provisions.* It's followed on page 41 by Other Faculty Policies, with policies, procedures and conventions in the form of Bylaws, rules adopted by the Senate, and policy summaries. . . . [emphasis added])."

Thus, unless otherwise expressly provided, the provisions under the heading "Academic Freedom and Tenure"—including title II's provision for notice of non-reappointment, on which plaintiff relies—apply only to tenured or tenure-eligible faculty members.[18] This conclusion is confirmed by a closer reading of title II itself.

Title II comprises sections X (entitled "General Appointment Procedures Affecting the Full-Time Tenure-Earning Ranks"), XI (entitled "Notification of Non-Tenured Faculty Members") and XII (entitled "Tenure Appointments"). Plaintiff concedes, as she must, that sections X and XII, by their terms and in their entirety, apply only to tenure-eligible faculty members.

---

**18.** To reiterate, title IV, dealing with discipline for violation of university rules, is expressly "Applicable to Both Tenured and Non-Tenured Faculty Members." That this includes faculty holding non-tenure track appointments is made plain by the first sentence of paragraph 1 of title IV: *"Quite apart from any question of tenure or the termination for cause of the service of a faculty member with tenure,* all faculty members have an obligation to comply with the rules and regulations of the University and its schools, colleges, and departments" (emphasis added).

She argues, however, that part (but not all) of section XI applies to all non-tenured faculty members, whether or not they are tenure-eligible. To assess this argument, it is helpful to set forth section XI in pertinent part, with the language on which plaintiff relies italicized:

"XI. Notification of Non-Tenured Faculty Members"

"1. [Notification; prospects] During his or her probationary period, each full-time assistant professor, associate professor, and professor shall be notified annually by the departmental head or chairperson, or by the dean in schools without departmental organization, of his or her prospect of being recommended by the department on the evidence then available for an appointment resulting in tenure. Where it is unlikely that tenure will be achieved, such notification shall be in writing.

"2. [Notification; no reappointment] *Notice of intention not to reappoint a full-time assistant professor,* associate professor, or professor *shall be sent to the individual affected according to the following schedule*:

"a) Not later than March 1 of the first year of academic service, if the appointment is to be terminated on August 31.

"b) Not later than December 15 of the second year of academic service, if the appointment is to be terminated on August 31.

"*c) In all other cases, not later than August 31, if the appointment is to be terminated on the following August 31, or not later than one year before the termination of the appointment*." (Emphasis added and footnote omitted.)

Plaintiff does not dispute that paragraph 1 of section XI, by its terms, applies only to tenure-eligible faculty members.[19] She argues, however, that there is at least an ambiguity as to whether paragraph 2 of section XI, requiring advance notice of an intention not to reappoint, applies to faculty members ineli-

---

**19.** Indeed, if section 1 were construed otherwise, it would make no sense, since its sole provision is a requirement that a faculty member to whom it applies be given annual notification of "his or her prospect of being recommended . . . for an appointment resulting in tenure."

gible for tenure, since paragraph 2 does not contain language expressly limiting its application to tenure-eligible faculty. Based on this reasoning, plaintiff contends that, because she was well beyond her second year of service when NYU determined not to reappoint her, she was entitled, under subparagraph c of paragraph 2 of section XI, to one year's notice that she would not be reappointed—or that whether she had such a right is at least a triable issue of fact. We are not persuaded by this argument.

As previously noted, plaintiff's proposed interpretation of the Handbook runs afoul of the Court of Appeals' admonition to avoid manufacturing artificial ambiguities by isolating a particular clause in a vacuum while ignoring the context and structure of the contract as a whole (*see Riverside S. Planning Corp. v CRP/Extell Riverside, L.P.*, 13 NY3d at 404; *see also Beal Sav. Bank v Sommer*, 8 NY3d 318, 324 [2007] ["a contract should be read as whole, and every part will be interpreted with reference to the whole" (internal quotation marks omitted)]). A review of the structure and context of the Handbook as a whole makes it clear that paragraph 2 of section XI, like the preceding paragraph 1, applies only to probationary tenure-track employees. Title II, of which section XI is a part, is included in the portion of the Handbook entitled "Academic Freedom and Tenure," which, as noted, applies only to tenured and tenure-eligible faculty members except where otherwise expressly provided. The preceding and following titles, title I and title III, explicitly set forth procedures relevant only to tenured and tenure-eligible faculty. Further, as previously discussed, the sections of title II that immediately precede and follow section XI (sections X and XII), apply, by their terms, only to tenure-eligible faculty (dealing, respectively, with tenure-eligible appointments generally and appointments resulting in tenure). Finally, as also previously discussed, section XI itself contains only two paragraphs, the first of which, paragraph 1 (requiring annual notification of the prospect of achieving tenure), on its face can apply only to tenure-eligible faculty. Accordingly, the structure and context of the Handbook makes it clear that the title of section XI ("Notification of Non-Tenured Faculty Members") refers to probationary tenure-track faculty, and, similarly, that the notice requirements of paragraph 2 of section XI apply only to probationary tenure-track faculty members (*see Bijan Designor For Men v Fireman's Fund Ins. Co.*, 264 AD2d 48, 52 [1st Dept 2000] ["Words considered

in isolation may have many and diverse meanings. In a written document the word obtains its meaning from the sentence, the sentence from the paragraph, and the latter from the whole document"], *lv denied* 96 NY2d 707 [2001]).

Further, plaintiff's proposed reading of paragraph 2 of section XI would create an impermissible conflict with another provision of the Handbook that expressly applies to her (*see National Conversion Corp. v Cedar Bldg. Corp.*, 23 NY2d 621, 625 [1969] ["All parts of an agreement are to be reconciled, if possible, in order to avoid inconsistency"]). This is Bylaw 73 ("Non-Tenure Positions"), which appears in the section of the Handbook entitled "Other Faculty Policies," under the heading "Faculty Titles" (*see* the portion of the table of contents set forth above). Bylaw 73 provides in pertinent part:

> "Instruction or research service shall be without tenure implications of any kind, regardless of rank or title, if rendered in *a part-time capacity, or in a temporary position*, or in a program having a subsidy of limited duration. Appointment to a non-tenure position shall be for a definite period of time, not exceeding one academic year unless otherwise specified, and *shall automatically terminate at the close of that period unless there is an official notice of renewal. Non-tenure positions include the following*" (emphasis added).

After the word "following," Bylaw 73 sets forth a bullet-point list of non-tenured positions. The fourth bullet point lists the following titles: "clinical professor, clinical associate professor, clinical assistant professor[.]" At the end of this line, a footnote is appended, which states: "*In the School of Medicine*, these designations denote part-time status. *For full-time service appointments, the designations* 'Professor (Research or Clinical)', 'Associate Professor (Research or Clinical)', and '*Assistant Professor (Research or Clinical)' are used*" (emphasis added).

Since plaintiff does not dispute that her position in the School of Medicine—Assistant Professor (Clinical) of Radiology—was not eligible for tenure, her claim for breach of contract cannot be sustained unless section XI, paragraph 2's requirement of prior notification of intent not to reappoint, on which plaintiff relies, can somehow be harmonized with Bylaw 73's provision that non-tenure positions "shall be for a definite period of time . . . and shall automatically terminate at the close of that period unless there is an official notice of renewal." Plaintiff's ef-

forts to harmonize these provisions are unavailing as a matter of law.

To reconcile Bylaw 73 with the application to a non-tenure track faculty member (such as herself) of the notification provision of section XI, paragraph 2, plaintiff chiefly argues that the "automatic[ ] terminat[ion]" provision of Bylaw 73 applies only to part-time faculty. Since plaintiff's position was full-time, she reasons, section XI, paragraph 2 (which states that it applies to "a full-time assistant professor, associate professor, or professor") applied to her. Contrary to this argument, however, Bylaw 73 expressly applies to all non-tenure track positions, whether full-time or part-time. The provision begins by stating that "[i]nstruction or research service shall be without tenure implications of any kind . . . if rendered in a part-time capacity, *or in a temporary position*, or in a program having a subsidy of limited duration" (emphasis added). The word "or" is a disjunctive article that generally indicates a choice between one of two alternatives (*see generally Colbert v International Sec. Bur.*, 79 AD2d 448, 463 [2d Dept 1981], *lv denied* 53 NY2d 608 [1981]). Nothing in Bylaw 73 excludes full-time temporary positions—such as plaintiff's expressly temporary appointment—from the application of its automatic termination provision. Moreover, the above-quoted footnote including an appointment as an " 'Assistant Professor (Research or Clinical)' " as a non-tenure position expressly notes that this designation denotes a "full-time service appointment[ ]." Plaintiff's argument that the automatic termination provision of Bylaw 73 did not apply to her because her position was full-time is simply untenable.

Also unavailing is plaintiff's alternative argument that, even if Bylaw 73 does apply to her (as we find that it does), the notification requirement of section XI, paragraph 2 could also be applied to her without creating an inconsistency. Plaintiff contends that although Bylaw 73 states that her position "shall automatically terminate . . . unless there is an official notice of renewal," she is still entitled to notification of an intention not to renew the appointment under section XI, paragraph 2. This proposed interpretation is unavailing because it would lead to an illogical result (*see Matter of Lipper Holdings v Trident Holdings*, 1 AD3d 170 [1st Dept 2003]). Application to non-tenured faculty members of section XI, paragraph 2's requirement of advance notice of an intention not to reappoint would make no sense because, in the case of a faculty member

having more than two years of service, NYU would have to give the faculty member notice of its intention not to reappoint simultaneously with the making of a one-year appointment. This would utterly negate Bylaw 73's provision that non-tenure appointments "shall automatically terminate at the close of th[e] period [for which the appointment was made] unless there is an official notice of renewal." Again, we are required to construe the parties' agreement—the Handbook—to avoid inconsistencies between different provisions (see *National Conversion Corp.*, 23 NY2d at 625). Here, Bylaw 73 expressly applies to faculty in non-tenure track positions, whether full-time or part-time, and the natural reading of section XI, paragraph 2, is that it applies only to full-time faculty in tenure-eligible positions. Accordingly, the latter provision did not apply to plaintiff, and her breach of contract cause of action is without merit as a matter of law.

Accordingly, the order of the Supreme Court, New York County (Eileen A. Rakower, J.), entered June 16, 2016, which, to the extent appealed from as limited by the briefs, granted defendants' motion for summary judgment to the extent of dismissing plaintiff's claim for age discrimination in violation of the NYCHRL, and denied the motion with respect to plaintiff's claim for breach of contract, should be modified, on the law, to grant the motion with respect to the claim for breach of contract, and otherwise affirmed, without costs. The Clerk is directed to enter judgment in favor of defendants dismissing the complaint.

SWEENY, MOSKOWITZ, GISCHE and KAPNICK, JJ., concur.

Order, Supreme Court, New York County, entered June 16, 2016, modified, on the law, to grant the motion with respect to the claim for breach of contract, and otherwise affirmed, without costs. The Clerk is directed to enter judgment in favor of defendants dismissing the complaint.